IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

SONROB HOSTS, LLC, an Arkansas
Corporation d/b/a LOOKOUT LODGE                                    PLAINTIFF

v.                              Case No. 3:11-CV-03094

LAFAYETTE INSURANCE COMPANY, a
Louisiana Corporation                         DEFENDANT/COUNTER CLAIMANT

v.

ROBERT AND SONJA SCHMID, Husband and
Wife; SONROB HOSTS, LLC, an Arkansas
Corporation                                   COUNTER DEFENDANTS

**MEMORANDUM OPINION**

On the 11th day of September, 2012, this matter came on for trial before the Court with the

parties having waived the right to a jury trial (Doc. 41).  During the one-day bench trial the Court

heard testimony from witnesses for each party and received exhibits into evidence.  The parties filed

simultaneous post-trial briefs on September 21, 2012.  (Docs. 45-46).  The case is now ripe for

decision.

**I.  Procedural History**

This action was filed on September 2, 2011 in the Circuit Court of Carroll County, Arkansas.

The plaintiffs were Sonrob Hosts, LLC ("Sonrob"), and Robert and Sonja Schmid ("the Schmids").

On October 3, 2011, the defendant, Lafayette Insurance Company ("Lafayette"),[1] removed the action

---

[1] Catlin Insurance Company d/b/a United Fire Group, was also originally named as a separate
defendant in this case.  However, Plaintiff's counsel stipulated during a telephonic pre-trial
conference held on August 27, 2012, that Catlin Insurance Company was not served with a copy of
the Complaint and never entered an appearance in this case.  The Court therefore dismissed Catlin
Insurance Company from the case by Order dated August 28, 2012.  (Doc. 30).

to this Court based on diversity jurisdiction under 28 U.S.C.§ 1441(a).  This is a breach of contract action based on a commercial policy of insurance ("the Policy") issued by Lafayette to Sonrob providing coverage from October 29, 2010 to October 29, 2011.  Robert and Sonja Schmid are the two members of Sonrob.[2]  Sonrob owns a motel in Eureka Springs, Arkansas called the Lookout Lodge.  The Schmids operate the Lookout Lodge and reside in living quarters in the motel.  In early January 2011, when the motel was closed for the winter season, a water pipe in one of the motel rooms froze and burst, causing substantial water damage to the motel.  Sonrob notified Lafayette of the loss, and Lafayette's claims adjuster  investigated the claim.  Lafayette denied the claim based on an exclusion in the policy for loss or damage resulting from frozen plumbing.  Sonrob and the Schmids commenced this action against Lafayette alleging that there was coverage for the loss under the Policy and that they were entitled to recover damages for the losses sustained due to the water damage to the motel.

Lafayette filed a Motion in Limine (Doc. 28) seeking, in part, to exclude any references to any personal claims for damages by the Schmids as individuals.  During a telephone conference on August 27, 2012, Plaintiff's counsel represented to the Court that the Schmids were parties to the action because they performed work on the clean-up necessitated by the water damage after Lafayette denied coverage and refused to pay on the claim.  Lafayette's Motion in Limine was denied by Order dated September 10, 2012.  (Doc. 42).  The Court, instead, raised the issue of whether the Schmids had standing to bring a claim against Lafayette at the final pretrial conference held prior to commencement of the bench trial on September, 11, 2012, stating that the issue of standing should

---

[2]  Plaintiffs styled the case in the original complaint, and it therefore remains styled, as "Sonrob Hosts, LLC, an Arkansas Corporation d/b/a Lookout Lodge."  Sonrob Hosts, LLC is an Arkansas limited liability company, and not an Arkansas corporation.

have been raised by a motion to dismiss. The parties offered no additional proof on the issue of standing. The Court concluded, however, that since the Schmids were not insureds under the Policy,[3] they had no standing to assert individual claims in a breach of contract action on the Policy. The Court stated that, in the event there was a finding that the loss was covered under the Policy, Sonrob could possibly have a claim for the work performed by the Schmids during the clean-up effort. The Court then ruled that Robert Schmid and Sonja Schmid would be dismissed as separate plaintiffs in this action.

The case then proceeded to a bench trial. The parties stipulated to the admissibility of certain pre-marked exhibits, and made objections to certain proffered exhibits. The parties stipulated to the damages incurred by Sonrob for the water damage from the frozen pipe except for any claim by the Schmids for clean-up work they performed. The Court will briefly summarize the witnesses' testimony, with more detailed findings included in the findings of fact section below.

Sonrob called two witnesses: John Perkins and Robert Schmid. Perkins is a retired contractor, master heat and air technician, and master electrician. Perkins has extensive experience working on hotels and motels in the Eureka Springs area, and had previously done work at the Lookout Lodge. In January 2011, he performed clean-up and repair work on the Lookout Lodge necessitated by the water damage. Perkins's experience includes making repairs to frozen pipes in the Eureka Springs area. Before making the repairs, Perkins examined the broken pipe and the area where the water damage occurred. Perkins formed an opinion as to what caused the pipe to freeze.

---

[3] The Policy provides that if the named insured is a limited liability company, the members are also insureds, but only with respect to the conduct of the business. (Doc. 9-4, p. 29). Since the damages at issue in this case occurred as a result of a frozen water pipe, and not as a result of the Schmids's conduct of their business, the Schmids are not insureds under the Policy for the purposes of this case.

Perkins believed that the pipe froze when cold air penetrated a hole in the exterior wall adjacent to the hot water pipe in Room 23, and that the lack of sufficient insulation combined with the wind and cold air caused the pipe to freeze.

The Schmids purchased the Lookout Lodge through Sonrob in 2008. Robert Schmid testified that he and his wife learned from the former manager, David Bland, how to operate the motel and, in particular, how to maintain heat in the motel when it was closed for the winter season. The Schmids closed the motel for the winter season in December 2010, and the water damage from the frozen pipe occurred in January 2011 when the Schmids were out of town.

Lafayette called three witnesses: Shane Haight, William Ford, and Lynn O'Neill-Robb. Shane Haight is a claims adjuster for the United Fire Group, Lafayette's parent company. Haight's experience as a claims adjuster included investigation of claims for water damage from frozen pipes. Haight responded immediately to the notice of loss made by Sonrob, and made an investigation into the cause of the frozen pipe. Haight retained a consulting mechanical engineer, William Ford, to assist him in his investigation. Haight made two trips to inspect the Lookout Lodge and met once with Robert Schmid to discuss the claim.

William Ford is a consulting mechanical engineer who was retained by Lafayette to determine the cause of the frozen pipe. Ford inspected the motel on one occasion approximately one month after the loss occurred. Ford prepared a report for Lafayette that stated that the pipe froze in the subfloor of Room 23 of the Lookout Lodge and that the cause of the frozen pipe was the failure to maintain heat in Room 23. Ford offered an opinion that there was not sufficient heat in the building to prevent the pipe from freezing in the subfloor. Ford did not believe that the pipe froze in the wall adjacent to the exterior in Room 23. He did agree that the pipe burst in Room 23

-4-

from pressure from  the freezing of the pipe in the subfloor.

Lynn O'Neill-Robb is a claims examiner employed by Lafayette.  O'Neill-Robb received the reports from Shane Haight and William Ford and made the decision to deny the claim  based on the exclusion in the Policy for loss or damage from frozen pipes.  O'Neill-Robb relied on those reports and concluded that the frozen-pipe exclusion applied and that the exception to the exclusion – applicable if the insured used its best efforts to maintain heat in the building – did not apply, because the heater was not turned on in Room 23.

The Court received into evidence the Policy, a diagram prepared by Robert Schmid depicting the method of cross heating the building when the motel was closed, photographs of the rooms damaged by the water from frozen pipes, climatological records showing the temperature in the region at the time of the loss, the ruptured pipe cap, and a stipulation of the damages caused by the water damage from the frozen pipe.  The Court will refer to the evidence through exhibit numbers in the findings of fact below.

## II.  Findings of Fact

1. Sonrob and Lafayette were citizens of different states at the time of removal of this action to federal court.  The amount in controversy between the parties exceeds $75,000, exclusive of interest and costs.

2. Sonrob is the owner of the Lookout Lodge, a motel in Eureka Springs, Arkansas.  Robert and Sonja Schmid are the only two members of Sonrob.  The Schmids reside in the living quarters of the Lookout Lodge, and manage the day-to-day operations of the motel.  The Schmids purchased the Lookout Lodge through Sonrob in 2008 and have continuously managed and operated the motel since 2008.

3.      Sonrob purchased from Lafayette a comprehensive commercial policy of insurance on the Lookout Lodge.  Lafayette issued policy number 60382097 to Sonrob.  The Policy provided coverage from October 29, 2010 to October 29, 2011.  Sonrob had paid its premiums for the Policy period.

4.      The Policy contained an exclusion for loss or damage caused by frozen plumbing.  The exclusion did not apply, however, if the insured did its best to maintain heat in the building. The relevant policy language is as follows:

**SECTION 1- PROPERTY**

**A. Coverage**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

. . .

**B.  Exclusions**

2.      We will not pay for loss or damage caused by or resulting from any of the following . . .

**e. Frozen Plumbing**
Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:
        **(1)**     You do your best to maintain heat in the building or structure; or
        **(2)**     You drain the equipment and shut off the supply if heat is not maintained.

(Docs. 9-3, p. 23 and 9-4, p. 5).

5.      The Schmids generally closed the Lookout Lodge to customers for approximately four to six weeks in the winter, which was customary for motels in the Eureka Springs area.  When the

Schmids purchased the motel in 2008, the former manager of the motel, David Bland, instructed the Schmids on "cross heating" the building, which involved turning on the heaters in certain parts of the building when the motel was closed to customers. The concept of the cross-heating system is that, by turning on the heat in selected rooms, the heat from those rooms will cross heat any rooms where the heat is turned off and maintain sufficient heat in the building overall in order to prevent pipes from freezing. Cross heating is a common practice used in motels in the Eureka Springs area to reduce the utility bills for a motel when it is closed to customers during the winter off-season. From 2008 until the loss in early 2011, the Schmids did not have any problems with freezing pipes in the Lookout Lodge when implementing the cross-heating system, even though temperatures had gone below freezing in the area during that time.

6.      The Lookout Lodge is a three-story building with 16 rooms and a living quarters. Each guest room has its own wall heater. The building is cross heated by turning on the heat in selected rooms to the "low heat" position with the wall heaters in the remaining rooms turned to the "off" position. The cross-heating system depicted on Plaintiff's Exhibit #3 shows the rooms that were heated. Robert Schmid believed that the heat in the selected rooms distributed and maintained sufficient heat in the building overall to keep pipes from freezing.

7.      The Schmids closed the Lookout Lodge at some point in late December of 2010 or early January of 2011 and began implementing the cross-heating system as depicted on Plaintiff's Exhibit #3.

8.      The Schmids left Eureka Springs on January 12, 2011, for a vacation in Mexico. Marty Cogan, an employee at the Lookout Lodge, was to look after the motel while the Schmids

were in Mexico.

9.      On the morning the Schmids left for their trip, the temperature in Eureka Springs was about
13 degrees Fahrenheit.  The climatological records for Rogers, Arkansas (approximately 70
miles west of Eureka Springs) showed the low temperature for January 12, 2011, was 3
degrees Fahrenheit.

10.     A hot water pipe burst in Room 23 sometime between the dates of January 12 to January 16,
2011, as a result of water freezing in the pipe due to very low temperatures in the area.
While it is impossible to know for certain whether other pipes at the Lookout Lodge froze
during that same time period, the pipe in Room 23 was the only pipe that ruptured at the
motel.

11.     On January 16, 2011, Marty Cogan called Robert Schmid and reported a wet spot on the
pavement in front of the motel, which she thought was from melting ice.  The next day,
Cogan discovered extensive water damage from a broken pipe and called Robert Schmid to
report the problem.  Schmid instructed Cogan to call a plumber and to notify the local
insurance agent of the loss.

12.     After being contacted by Cogan, Robert Schmid called John Perkins, a local contractor, and
asked him to inspect the property to determine the cause of the water damage.

13.     After being notified of the loss, the local insurance agent arranged for Service Pro, a
professional cleaning company, to begin the clean-up of the water damage.

14.     On January 17 or 18, 2011, Lafayette's claims adjuster, Shane Haight, began an investigation
of the claim.  Haight met with John Perkins at the Lookout Lodge, and they discussed the
heat situation in the building. Perkins told Haight that the heaters were not turned on in

Rooms 13 and 23.  Haight was aware that the Policy contained an exclusion for loss or damage from frozen plumbing.  Perkins showed Haight the ruptured pipe cap and its location in Room 23.

15.     The Schmids returned to Eureka Springs on January 19, 2011, and began cleaning up the motel upon learning from the local insurance agent that Lafayette was planning to deny the claim.  The claims adjuster met with the Schmids one week later and confirmed that the heater was not turned on in Room 23.  The claims adjuster told the Schmids that there was an exclusion in the policy for loss or damage resulting from frozen pipes.

16.     From his inspection on January 17, John Perkins determined that the broken pipe causing the water damage was located in a partition wall in Room 23.  According to Perkins, the pipe that burst was located within inches of an exterior wall of the building.  Perkins observed a break in the outside wall covering that allowed outside air to flow into the building at the point where the ruptured pipe was located.  It was Perkins's opinion that the pipe froze in Room 23 from cold air penetrating the exterior wall into the area where the pipe was located.  Perkins believed that the pipe in Room 23 along the exterior wall did not have adequate insulation.  Perkins did not locate any other broken water pipes in the building.

17.     About one month after the loss, Lafayette retained William Ford, a consulting engineer, to render an opinion on the cause of the broken pipe.  Ford went to the Lookout Lodge with Shane Haight to inspect the motel.  Ford inspected the pipes in the subfloor of the motel and the location of the pipe in Room 23 where the pipe burst.  At the time Ford inspected the pipe, the repairs had already been made to the pipe.  The opening in the outside wall sheeting noted by Mr. Perkins was no longer apparent, and Ford was unaware of the opening at the

time he prepared his report. Ford was of the opinion that the freezing of the pipe occurred in the subfloor, and pressure from the frozen pipe caused the pipe to burst at the end of the pipe in Room 23. Ford did not believe there was freezing of the pipe above the subfloor. Ford did not believe that the cross-heating system implemented by the Schmids supplied sufficient heat to the subfloor between Rooms 13 and 23 to prevent the pipe from freezing. Ford did not find any cracks or crevices in the subfloor that would allow air from outside to penetrate into the subfloor.

18. The Court finds the testimony of John Perkins to be more credible than the testimony of William Ford and accepts John Perkins's findings regarding the location of the freeze within the pipe and the cause of the pipe freezing. Even though the heat was not turned on in Room 23, the most likely cause of the freeze was the penetration of cold air to a pipe that was not adequately insulated. The pipe would have likely frozen from the cold air even if the heat were turned on in Room 23.

19. Under the cross-heating system as it was implemented by the Schmids in December 2010 and January 2011, heat was supplied to the building by turning on the heaters in Rooms 4, 11, 12, 14, 24, and the living quarters. Room 24 is adjacent to Room 23, and both rooms are located on the top floor of the three-story building. The cross-heating system was being implemented when the pipe froze sometime between the dates of January 12 and January 16. Sonrob provided Lafayette the diagram (Plaintiff's Exhibit #3) which depicted how the cross-heating system was being used to heat the Lookout Lodge.

20. Lynn O'Neill-Robb, who appeared as the corporate representative for Lafayette at trial, is employed as a claims examiner for Lafayette. O'Neill-Robb discussed Sonrob's claim with

Shane Haight, William Ford, and Lafayette's legal counsel.  Based on those discussions, O'Neill-Robb recommended that the claim be denied pursuant to the exclusion in the Policy for frozen plumbing.  O'Neill-Robb concluded that Sonrob did not use its best efforts to maintain heat in the building because the heater was not turned on in Room 23.  O'Neill-Robb was of the opinion that a reasonable person would have heated all of the rooms in the building.

21.     Lafayette followed O'Neill-Robb's recommendation and denied the claim by letter to Sonrob dated February 17, 2011, approximately one month after the loss.

22.     In response to a request from the Arkansas Insurance Department concerning Sonrob's claim, Lafayette stated in a letter dated May 27, 2011 that, based on its attorney's opinion, the language in the Policy "you do your best" may be construed by a court as ambiguous.  While acknowledging its attorney's opinion as to ambiguity, Lafayette represented that the facts surrounding Sonrob's claim were "very strong to support the position that the insured did not do their best to maintain heat." (Court Exhibit #1) The letter stated that "by not having any heat on in 81% of the building including the area where the damage occurred and the fact of [sic] the insured's [sic] did not have anyone inspect and maintain the building in their absence would not be construed as their best effort to maintain heat." *Id.* The letter was signed by Lynn O'Neil-Robb, Claims Examiner.

### III.  Conclusions of Law and Findings Regarding Mixed Issues of Fact and Law

1.     This Court has subject matter jurisdiction over this action based on diversity of citizenship under 28 U.S.C. § 1332.

2.     The exclusion in the Policy for loss or damage resulting from frozen pipes should be strictly

construed against the insurer, Lafayette. *Aetna Cas. & Sur. Co. v. Stover*, 327 F.2d 288 (8th Cir. 1964).

3. The language in the Policy exclusion, "[y]ou do your best to maintain heat in the building or structure," is ambiguous and susceptible to various meanings and interpretations. The Policy does not define what it means to "do your best" to "maintain heat." That ambiguous language is to be construed against the insurer, Lafayette, in favor of the insured, Sonrob. *Canal Ins. Co. v. Ashmore*, 126 F.3d 1083 (8th Cir. 1997).

4. Language in the Policy requiring Sonrob to "do its best," when reasonably construed in favor of Sonrob, imposes a duty on Sonrob to use "reasonable efforts." *See Business Health Prop. v. Millers Capital Ins. Co.*, 2010 U.S. Dist. LEXIS 118400 (N.D. Ohio) (analyzing "do your best" clause in insurance policy according to a reasonableness standard). A best efforts requirement in a contract should be viewed as requiring good faith and sound business judgment. *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 234-235 (3rd Cir. 2001). Sonrob, via the Schmids, acted in good faith in exercising their business judgment to use the cross-heating system to maintain heat at the Lookout Lodge in December of 2010 and January of 2011.

5. "Maintain," when used in insurance contracts, has also been construed by certain courts as ambiguous, although in a different context. *See e.g.*, *Five Star Hotels, LLC v. Ins. Co. of Greater N.Y.*, 2011 U.S. Dist. LEXIS 31313 (S.D. N.Y. 2011) (finding "maintain," as used in insurance policy clause requiring the insured to "maintain" certain protective devices to be "hopelessly ambiguous"). The Court could find, therefore, that it is unclear what the Policy required in regards to "maintaining heat." No matter the interpretation of "maintain,"

however, the Court concludes that Sonrob did maintain heat in the building by implementing a cross-heating system, which is a commonly used system in motels in the Eureka Springs area when a motel is closed to customers for the winter off-season.

6.    The Policy language did not require Sonrob to maintain heat in each room, but rather to maintain heat in the building.  Cross heating is a reasonable method to maintain heat in the building to prevent pipes from freezing when the motel is closed to customers.  The fact that cross heating is commonly used in motels in the Eureka Springs area; that the Schmids had used the system successfully in times of low temperatures in the past; that the Schmids implemented the system based on the advice of the former motel manager who also claimed to have used the system to heat the same motel; and that no other pipes in the building burst despite the low temperatures in Eureka Springs in January 2011 all tend to indicate and to support the Court's finding that the Schmids acted reasonably and in good faith in implementing the cross-heating system to maintain heat at the Lookout Lodge in January 2011.

7.    The "do your best" clause in the Policy cannot be construed so as to mandate that Sonrob, acting through the Schmids, go beyond exercising good business judgment to heat every room in the motel at all times, regardless of whether the motel is open for business and regardless of whether a reasonable method is available that would maintain heat at an adequate level throughout the building.

8.    Lafayette denied the claim because the heater was not turned on in Room 23, although the Policy did not require that heat be turned on in each room of the motel.  The Court disagrees and rejects Lafayette's position that a reasonable person would have turned on the heat in

every room of the motel based on the facts and circumstances of this case.

9.      Because of the ambiguity in the language of the Policy regarding best efforts, the Court concludes that the Policy only requires the insured to use reasonable efforts to maintain heat in the building and that Sonrob used reasonable efforts to maintain heat in the building by implementing the cross-heating system. The damages to the Lookout Lodge did result from a frozen pipe, which would cause Sonrob's claim to fall under the frozen-pipe exclusion of the Policy. However, because the Court concludes that Sonrob did its best to maintain heat in the Lookout Lodge – within the meaning of that clause as interpreted by the Court – Sonrob's claim is excepted from the frozen-pipe exclusion, and the loss sustained by Sonrob is a covered loss under the terms of the Policy.

10.     Lafayette made a material misrepresentation to the Arkansas Insurance Department in response to an inquiry from the Department about Sonrob's claim. Lafayette's statement that 81% of building was not heated was a material misrepresentation, as was the statement that the insureds did not have anyone to maintain the building in their absence. No one would conclude that 81% of the building was not heated based on the cross-heating diagram Sonrob provided to the claims adjuster for Lafayette. Also, Sonrob's employee, Marty Cogan, did maintain the building during the Schmids's absence. She discovered the water damage and immediately reported it to Robert Schmid. Although the misrepresentations were not made to the insureds, they tend to show Lafayette's unreasonableness in handling Sonrob's claim under the Policy.

13.     The Lookout Lodge sustained water damages covered under the Policy. The Court finds, in accordance with the parties' stipulation, that Sonrob has substantiated actual damages from

the loss in the amount of $63,116.77.  The Court further finds that the work performed by the Schmids for Sonrob on the clean-up of the water damage is an additional recoverable element of damage, since their work was necessitated by the water damage that the Court has found to be covered under the Policy, and the Schmids should not be penalized for being resourceful in the face of an improper denial of coverage by Lafayette.  Robert Schmid worked on the clean-up for 248 hours, and Sonja Schmid worked on the clean-up for 95 hours, for a total of 343 hours. John Perkins testified that he paid his workers between $15 and $20 to perform work similar to what the Schmids performed.  Because the Court cannot determine whether the Schmids have the same qualifications for performing such work as Perkins's employees, the Court finds that a discounted rate of $12 an hour is reasonable compensation for the work performed by the Schmids.  The Court will therefore award Sonrob an additional $4,116 in damages for work performed by the Schmids.

14.  Under Ark. Code Ann. Section § 23-79-208, Sonrob is also entitled to recover a 12% statutory penalty and all reasonable attorney's fees.

15.  The Court concludes, based on the findings set forth above, that judgment should likewise be entered in favor of Sonrob on Lafayette's counterclaim for declaratory judgment.  To the extent that Lafayette's counterclaim remains pending as against the Schmids, the counterclaim will be dismissed based on the Court's prior determination that the Schmids were not insureds under the Policy and lacked standing to bring a claim against Lafayette in this matter.

## IV. Conclusion

The Court finds that the damages to Lookout Lodge that occurred in January 2011 are

-15-

covered under the Policy issued by Lafayette to Sonrob.  Sonrob is entitled to receive from Lafayette compensatory damages totaling $67,232.77, plus a 12% statutory penalty in the amount of $8,067.93 and all reasonable attorney's fees for the prosecution and collection of the loss pursuant to Ark. Code Ann. § 23-79-208(a)(1).  Sonrob is also entitled to prejudgment interest because "the amount of damages is definitely ascertainable by mathematical computation . . ." *Ozarks Unlimited Resources Coop., Inc. v. Daniels*, 333 Ark. 214, 224 (1998).  Prejudgment interest will be assessed on the amount of the stipulated loss[4] of $63,116.77, with the parties to confer and present to the Court via stipulation or motion pleadings the amount of prejudgment interest they believe is due to Sonrob in this matter.  Post-judgment interest shall accrue at the prevailing legal rate of 0.18% per annum from the date of entry of judgment until paid. *See*  28 U.S.C. § 1961; *Mobil Exploration & Producing North America, Inc. v. Graham Royalty Ltd*, 910 F.2d 504, 509 (8th Cir. 1990) (in actions based on diversity of citizenship, postjudgment interest rate is determined according to 28 U.S.C. § 1961 and not Ark. Code Ann. § 16-65-114).  Sonrob will also be awarded its costs incurred in prosecuting this action. Fed. R. Civ. P. 54(d)(1).  A separate judgment will be entered consistent with this Memorandum Opinion.

Furthermore, judgment will be entered in favor of Sonrob on Lafayette's counterclaim, and the counterclaim will be dismissed to the extent it remains pending against Robert and Sonja Schmid.

The parties are strongly encouraged to confer with each other in an attempt to mutually resolve the issue of costs, fees, and prejudgment interest to be awarded, and may file a stipulation

---

[4] Since the damages awarded for the Schmids's clean-up efforts involved an element of discretion in the Court setting a reasonable hourly rate, it does not appear that prejudgment interest should be awarded as to that additional amount.

-16-

as to the total amount to be awarded.  However, in the event no agreement can be reached, Sonrob

is directed to file a motion for attorney's fees on or before Friday, November 9, 2012.  Lafayette will

have until Monday, November 19, to file any response.  Any such pleadings should also address the

issue of the amount of prejudgment interest Sonrob is entitled to receive from Lafayette.  The Court

will issue an amended judgment in accordance with its findings regarding costs, fees, and

prejudgment interest to be awarded.

      **IT IS SO ORDERED** this 26th day of October, 2012.

*/s/ P. K. Holmes,* III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE